IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BONN OPERATING COMPANY        §
                              §
VS.                           §        CIVIL ACTION 4:06-CV-734-Y
                              §
DEVON ENERGY PRODUCTION       §
COMPANY, LP                   §

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before the Court is defendant Devon Energy Production Company, LP ("Devon")'s Motion for Summary Judgment [doc. #43]. Devon has also renewed its motion to strike Bonn's summary-judgment evidence. After review, the Court concludes that many of Bonn's claims lack evidentiary support. Summary judgment is not proper, however, as to Bonn's claim that it was wrongfully charged certain expenses, referred to as CDP expenses, regarding the Fuller Ranch 25W-4 and Fuller Ranch 23W-14 wells. Summary judgment is also not proper as to Bonn's claim that Devon wrongfully retained Bonn's share of proceeds of production of oil and gas after Devon recouped certain contractual penalties. The Court further concludes that expert testimony is not needed to support Bonn's damage calculations in this case. In all other respects, Devon's motion will be granted.


I.  Background

This case arises out of a dispute covering eight oil and gas wells located in Wyoming. The parties agree that the "Form 610 Model Form Operating Agreement - 1956" ("the JOA") of March 25, 1971, which

was executed by the parties' predecessors in interest, governs this case. [See Mtn. Brief at 4; Resp. Brief at 3.[1]] Under that agreement, Devon Energy operates the unit area (which is defined by the JOA) and Bonn is a non-operating working-interest owner. [See Mtn. App. at 66.] The JOA provides that a party to the agreement desiring to drill a well must provide the other parties with written notice that includes location, depth, and estimated cost of the operation. [Mtn. App. at 86.[2]] This notice process is sometimes referred to as "balloting." [Mtn. Brief at 6.] Upon receipt of the notice, the other parties to the JOA have thirty days in which to elect whether they will participate in the operation. [Mtn. App. at 86.] One becomes a "non-consenting party" by either electing not to consent or by failing to make any election within the thirty days. [Id.] The cost and risk of drilling and conducting the operations are borne by the consenting parties. [Id.] While the non-consenting parties do not bear such costs and risks, they are subject to a penalty payable out of the proceeds of production, should the well produce. Under this contractual penalty, the consenting parties are entitled to the non-consenting parties' share of any of the production from the wells until its proceeds equal the total of 100% of each non-consenting party's share of certain costs (such as the normal cost to operate

---

[1] "Mtn. Brief" refers to Devon's brief in support of its motion for summary judgment [doc. #43]. "Resp. Brief" refers to Bonn's brief filed in response to Devon's summary-judgment motion [doc. #46].

[2] "Mtn. App." refers to the appendix submitted by Devon in support of its motion for summary judgment.

the well) and 300% of each non-consenting party's portion of other costs and expenses (such as the costs to drill and complete the well before it becomes operational and producing). [Id.]

It is undisputed that Devon, by letter dated February 12, 2003, notified Bonn of its intent to drill the eight wells under the JOA and that Bonn, on each occasion, elected to withhold its consent. [Mtn. App. at 2, 4-9; Mtn. Brief at 6.] Each of Devon's notices contained several enclosures, including an authorization for expenditure ("AFE") detailing the estimated costs for drilling and operation. [Mtn. App. at 2, 4-9.] One of the notices pertained to the well drilled on land described as Marquiss Federal 15W-12, which had already been completed. Bonn insists that the February 12 letter did not provide the notice contemplated by the JOA. [Resp. Brief at 6-7.] The letter, however, informed Bonn that the well had been drilled, was completed, and was producing. [Mtn. App. at 2, 4-9.] It also informed Bonn of the "estimated" costs associated with the drilling. [Mtn. App. at 8-9; Resp. Brief at 6-7.] Notwithstanding this knowledge, Bonn elected to withhold consent, also referred to as "going non-consent." [Mtn. App. at 33, 37; Comp.[3] at 3, ¶9.]

Bonn filed suit in this Court on October 10, 2008. Bond alleges that Devon violated the JOA when it drilled certain wells without consent, charged Bonn costs and penalties it was not entitled to,

---

[3] "Comp. at" will be used to cite to Bonn's First Amended Complaint. [doc. #32.]

and failed to credit revenue to Bonn as soon as Devon was reimbursed for its allowable charges. Further, Bonn asserts that Bonn is liable to it under a Wyoming state law.

Bonn filed a motion for summary judgment on November 26, 2007. Devon countered with a motion to strike Bonn's summary judgment evidence. In an order dated August 29, 2008, this Court granted Devon's motion to strike and denied Bonn's motion for summary judgment. Bonn's motion to reconsider has since been denied. Now before the Court is Devon's motion for summary judgment.

## II.  Discussion

### A.  Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo County.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the

Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). The movant may submit evidence that negates a material element of the respondent's claim or defense or show that there is no evidence to support an essential element of the respondent's claim or defense. *See Celotex*

*Corp v. Catrett*, 477 U.S. 317, 322-24 (1986).  To negate a material element of the respondent's claim or defense, a moving party must negate an element that would affect the outcome of the action.  *See Anderson*, 477 U.S. at 247.  If the moving party alleges that there is no evidence to support an essential element of the respondent's claim or defense, the moving party need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the moving party need only show that the respondent, who bears the burden of proof, has adduced no evidence to support an essential element of his case.  *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* Fed. R. Civ. P. 56(e).  This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

B.    Choice of Law

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits in order to determine which state's substantive law applies.    *See Hartford Underwriters Ins. Co. v. Foundation Health Servs., Inc*., 524 F.3d 588, 593 (5th Cir. 2008). The state of Texas applies the "most significant relationship" test. *See, e.g., Minn. Mining and Manu. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735-38 (Tex. 1997) (applying Restatement (Second) of Conflicts of Laws § 188(1) and the "most significant relationship" test to a contract dispute).    Under this test, in determining which state's law governs a contract dispute, a court must consider:

1)    the place of contracting;

2)    the place the contract was negotiated;

3)    the place of performance;

4)    the location of the contract's subject matter; and

5)    the parties' domicile, residence, nationality, place of incorporation, and place of business.

*See id.* at 735-36.    These contacts ("section 188 contacts") are considered in light of certain public-policy factors ("section 6 factors").    These factors are:

1)    the needs of the interstate and international systems;

2)    the relevant policies of the forum;

3)    the relevant policies of other interested states and the relative interests of those states in the determination

of the particular issue;

4) the protection of justified expectations;

5) the basic policies underlying the particular field of law;

6) certainty, predictability and uniformity of result; and

7) ease in the determination and application of the law to be applied.

*See id.* at 736; *see also* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 6(2) (1971).

Prior to applying these factors, a court must first determine whether there is a conflict between Texas law and other potentially applicable law. *See Sava Gumarska in Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc.,* 128 S.W.3d 304, (Tex. App.--Dallas 2004, no pet.) ("[W]e should first determine if the laws are in conflict. If the result would be the same under the laws of either jurisdiction, there is no need to resolve the choice of law question."); *Vandeventer v. All American Life & Casualty Company,* 101 S.W.3d 703, 711-12 (Tex.App.--Fort Worth 2003, no pet.)("In the absence of a true conflict, we need not undertake a choice-of-law analysis."). Devon provides an overview of the contract law of the states of Texas, Wyoming, and Oklahoma--the states relevant to this dispute. Under the law of each of these states, the terms of a contract are to be given their plain meaning in an effort to give effect to the contract as written. *See* OKLA. STAT. tit. 15, § 152 (2008) ("A contract must be so interpreted as to give effect to the

mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."); *Wadi Petroleum, Inc. v. Ultra Res., Inc.*, 65 P.3d 703, 708 (Wyo. 2003) ("[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them."); *Valance Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) ("Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense.").

Even so, it appears that Texas is the only of these states to apply general contract principles to one of the specific issues in this case--whether a party breaches a JOA by failing to ballot prior to drilling and completion of a well. *See Valance Operating Co.*, 164 S.W.3d at 662-63. In *Valance Operating Co.* the Texas supreme court applied basic contract principles in concluding that an operating interest owner did not breach an operating agreement by beginning operations, including drilling, before the notice period required by the agreement had expired. But rather than present a conflict, *Valance* is simply a specific application of general contract-law principles recognized by all of the states at issue. *See id*. at 663 (stating that the court's interpretation "effectuates the written agreement of the parties"). Indeed, Bonn concedes in its briefing that even if the Court concludes that Wyoming law governs this case *Valance* would still provide meaningful guidance in resolving the

timing-of-balloting issue.

More importantly to the question of whether a conflict exists, Bonn bases part of its claims on Wyoming statutory provisions that establish deadlines for payments related to the production of oil and gas interests and imposing an 18% per annum penalty for the failure to such payments timely. *See* WYO. STAT. ANN. § 30-5-301(a), 30-5-303(a) (2008). Although not relating to the conflict-of-law issue, Devon addresses and relies upon a similar Texas provision in its briefing. [Mtn. Brief at 23 (discussing TEX. NAT. RES. CODE ANN. § 91.402 (Vernon 2008)).] Oklahoma also has a statute setting a deadline for the payment of proceeds from the development of oil and gas interests and imposing a penalty for failure to do so. OKLA. STAT. tit. 52 § 570.10(B) (2008). The Court notes that the deadlines imposed by these provisions appear to apply only where the agreement does not specify a time for payments. *See, e.g.*, TEX. NAT. RES. CODE ANN. 91.402(a) (Vernon 2008) (stating that the statutory deadlines apply only when "the lease or other agreement does not specify the time for payment"). But the parties have not identified, nor has the Court's review disclosed, a provision within the JOA addressing the timing of payments. Thus, the deadline for payments will be provided by statute. Additionally, the penalties imposed by the statutes at issue seem to be in addition to any contractual penalties. *See* WYO. STAT. ANN. § 30-5-303(a) (stating that a person who fails to make timely payment is liable for eighteen percent interest on the unpaid principal

10

balance).  Consequently, the Court must assess whether the relevant statutes "conflict" so as to require application of the most-significant-relationship test.

Under Wyoming law, the proceeds derived from oil and gas production must be paid to all persons legally entitled to payment no later than six months after the first day of the month following the date of the first sale and, thereafter, no later than sixty days after the end of the calendar month in which subsequent production is sold.  WYO. STAT. ANN. § 30-5-301(a) (2008).  Texas law requires that proceeds derived from oil and gas production be paid on or before 120 days after the end of the month of the first sale of production.  TEX. NAT. RES. CODE. ANN. § 91.402.  Afterward, payments must be made as set out in the written agreement or, in the absence of a written agreement, payments for oil production must be made no later than 60 days, and payments for gas production must be made no later than 90 days, after the calendar month in which the production is sold.  *Id.*  Finally, under Oklahoma law payments must be made within six months after the date of the first sale and thereafter no later than the last day of the second succeeding month after the end of the month in which production is sold.  OKLA. STAT. tit. 52 § 570.10(B) (2008).  All states impose a penalty for failure to make timely payment, stated in terms of interest on the arrearage.  *See id.* at § 570.10(D); *see also* WYO. STAT. ANN. § 30-5-303(a); TEX. NAT. RES. CODE. ANN. § 91.403.  Despite the general similarity, the differences in the times for

payment and the penalty imposed by the three states at issue appears to be sufficient to create a conflict under Texas law. *See Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 260 (Tex. App.--San Antonio 1999, pet. denied) (performing a choice-of-law analysis based on the fact that the amount of damages under Mexican law is limited compared to that available under Texas law). Accordingly, the Court must perform the most-significant-relationship test with regard to the issue of the deadline for the payment of oil and gas production proceeds and the penalty to be imposed for failure to make such payments timely.

Devon asserts that the place where the contract is to be performed is the most important factor under the most-significant-relationship test. *See Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 54 (Tex. 1991). Indeed, "[a]s a rule, that factor alone is conclusive in determining what state's law is to apply." *Id.* (quoting *DeSantis v. Wackenhut*, 793 S.W.2d 670, 679 (Tex. 1990)). But this principle was derived from Restatement (Second) of Conflicts of Laws § 196, which does not apply to a contract contemplating services in many states. *See Sonat Exploration v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228 at *12-13.

Even so, the place of performance is an important factor to consider under the most-significant-relationship test. *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.3d 337, 344 (Tex. App.--Houston [14th Dist.] 2004, pet. denied). In its briefing, Devon notes that, depending on the activity at issue, the JOA was to be performed

in Texas, Wyoming, and Oklahoma. Because the oil and gas interests governed by the JOA are located in Wyoming, any drilling under the JOA must necessarily be in Wyoming. As for Oklahoma, Devon bills and sends notices related to the JOA from its Oklahoma offices. At first blush this may seem unimportant relative to the actions to be taken by Devon in Wyoming. But this case is based on Devon's failure to provide Bonn with written notice of its proposed operations along with an estimate of costs prior to drilling certain oil and gas wells, failure to provide an inventory of equipment and itemized statement of costs, allegedly charging Bonn expenses contrary to the JOA, failing to give Bonn credit for certain expenditures, and failure to make payments to Bonn for its interest in oil and gas produced by Devon. Thus, the performance at issue in this case was to occur in Oklahoma. *Cf. Maxus Exploration Co.*, 817 S.W.2d at 54 (noting that discrete issue under contract may be evaluated separately from contract as a whole); *see also Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 171-72 (Tex. App.--Houston [14th Dist.] 2002, no pet.) ("Nabors' claim in both cases is for liability and legal services incurred in Texas, not for drilling services performed in Louisiana. Considering only the particular issue in dispute, the place of performance of that obligation was in Texas."); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1) (1971) ("The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has

the most significant relationship to the transaction and the parties . . . ."). And more specifically, the particular issue under review is what state's laws govern the timing of payments and the penalty for failure to make timely payments, all of which relates to the administrative acts performed by Devon in Oklahoma. This factor, therefore, weighs in favor of applying Oklahoma law. *See Hughes Wood Products, Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex. 2000) (stating a court is to "consider which state's law has the most significant relationship *to the particular substantive issue to be resolved*.") (emphasis in original); *see also Farmers Ins. Exch. v. Leonard*, 125 S.W.3d 55. 63-64 (Tex. App.--Austin 2003, no pet.) (concluding that although insurance agents performed the functions that earned them bonuses in Texas, because the insurance company's calculation and remittance of such bonuses formed the basis of the suit and were performed in California, California law governed the case).

Next, as to the location of the parties, Devon notes that the original parties to the JOA were Oklahoma corporations. Devon is itself an Oklahoma limited partnership with its principal place of business in Oklahoma. Bonn is a Texas partnership with its principal place of business in Fort Worth, Texas. Bonn does not dispute these facts. Instead, Bonn merely points out that two other current parties to the JOA are Wyoming companies. Taking all of these facts into consideration, the Court concludes this factor supports applying

Oklahoma law. The original parties to the JOA were Oklahoma companies and thus, the terms of the JOA reflect their intent and expectations. Devon, a current party to the JOA and a party to this suit, is also an Oklahoma company. Bonn appears to be the only Texas company involved, and while two other parties to the JOA are Wyoming companies, they are not part of this suit and Bonn has not argued how their interests in the JOA are implicated by this suit.

Next, both Devon and Bonn agree that the subject matter of the JOA--oil and gas interests--is located in Wyoming. When a contract involves the exploitation of minerals, the state in which the minerals are located has a significant interest in the suit. *Texas Commerce Bank Nat'l Assoc. v. Interpol '80 Ltd. Partnership*, 703 S.W.2d 765, 773-74 (Tex. App.--Corpus Christi 1985, no writ) (stating that although the contract at issue was executed in Colorado, because its subject matter was exploitation of mineral interests in Texas, Texas had a legitimate and even special interest in the suit). Bonn argues that this factor is particularly strong in this case. Bonn bases this argument on the fact that the JOA requires insurance be provided to workers involved in mineral extraction operations in accordance "with the Workmen's Compensation Law of the State where the operations are being conducted." [Mtn. App. at 92.] Bonn further notes that the JOA's force majeure clause allows a party to suspend its obligations under the JOA due to, inter alia, "governmental restraint" and asserts that this refers to the state government of Wyoming. The fact that

15

specific clauses refer to a particular state's law does not lead to a conclusion that that state's law governs the contract as a whole. *See Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, No. 06-0979, 2008 Tex. LEXIS 999, at *5-8 (Tex. 2008) (concluding that it could not be surmised that the parties intended Louisiana law to govern the entire agreement based on the reference to Louisiana law in two provisions).

Bonn also notes that an oil and gas pooling agreement related to the JOA was filed with the Wyoming Oil & Gas Conservation Commission. Finally, Bonn contends that the title examination related to the mineral interests subject to the JOA and payment of ad valorem taxes on the interests are governed by Wyoming law. These facts are, however, no more than a consequence of the fact that the oil and gas interests governed by the JOA are located in Wyoming. That is, it is not unique to this case that certain aspects of an agreement relating to a real property interest relate to or are impacted by the law of the state in which the property is located. Thus, while this factor weighs in favor of applying Wyoming law it is not, at least for the reasons argued by Bonn, especially strong in this case. *See Sonat Exploration Co.*, 2008 Tex. LEXIS 999, at *9 ("[T]he location of the subject matter is [not] significant when the parties contemplate services in several states.").

The remaining section 188 contacts do not provide meaningful guidance in this case. Devon addresses the "place of contracting"

and "place of negotiation" factors, stating that because both of the original parties were Oklahoma companies it is a reasonable assumption that the JOA was negotiated and executed in Oklahoma. Bonn does not address these factors at all. Although it is true that "contracts should be governed by the law the parties had in mind when the contract was made," *Sonat Exploration Co.*, 2008 Tex. LEXIS 999, at *18, as recognized by Devon, any conclusion regarding the original parties' intent would be nothing more than an assumption. And while the intent of the current parties to the JOA would be illuminating, it is not addressed in the briefing and unclear from the record. Thus, the Court turns to the public policy or "section 6" factors.

A court is to consider the "needs of the interstate and international systems." This factor seeks to promote harmonious relations between states and to facilitate commercial intercourse between them. *Young v. American Bureau of Shipping*, NO. 01-96-00870-CV, 1998 Tex. App. LEXIS 3471, at *11 (Tex. App.—Houston [1st Dist.] June 4, 1998, no pet.) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. d (1971)). Relatedly, the policies of the forum, as well as other interested states are also to be considered. As discussed above, the forum state of Texas, as well as Oklahoma and Wyoming, impose statutory deadlines for the payment of proceeds from oil and gas production and penalties for failure to make timely payment. As the state in which the mineral interests at issue are located, Wyoming has a significant interest in seeing its laws applied

to this case. Indeed, a court is also to consider the need for certainty, predictability, and uniformity of result and Bonn argues that these ends are served by holding that Wyoming law governs the JOA, as it deals with mineral interest in Wyoming.

But Texas courts have also recognized that applying the law of the forum fosters certainty, predictability, and uniformity, if for no other reason than the forum court's familiarity with the forum's law. *See Young*, 1998 Tex. App. LEXIS 3471, at *14. And Texas, as the forum and the state where Bonn is domiciled, and Oklahoma, as the state where Devon and the original parties to the JOA are domiciled, have an interest in protecting their resident's reasonable contract expectations. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 850 (Tex. 2000). The parties' reasonable expectations can be assessed in light of the nature of the contacts with a given state. *See Young*, 1998 Tex. App. LEXIS 3471, at *13 (noting the importance of contacts with a particular state may justify expectation that that state's laws would apply). The fact that the JOA relates to mineral interests in Wyoming is a significant contact and may justify an expectation that Wyoming law would apply to drilling operations under the JOA. But the original parties to the JOA were Oklahoma companies. Devon, as a successor-in-interest and current operating party under the JOA, is also an Oklahoma company. Additionally, the JOA's provisions on payment of costs, expenses, and assessment of penalties make no reference to where these tasks will be performed and,

specifically, make no reference to Wyoming law.  These circumstances demonstrate that the parties could have held a reasonable expectation that Oklahoma law would govern the administrative tasks of balloting and billing.

Relatedly, a court must consider the underlying policy of the field at issue.  This factor is served by applying the law of the state with the greatest interest in the suit.  *See Young*, 1998 Tex. App. LEXIS 3471, at *14.  After review of the general contract law of the relevant states, and particularly their statutes governing the timing of payment of proceeds from oil and gas development, it appears that all relevant states share the same basic policy--that contracts are to be applied as written to give effect to the parties' intent and that payment of oil and gas proceeds should be promptly made.  Thus, applying the law of any of the states at issue would not significantly undermine the policy of another state.  And while the preceding discussion of the section 6 factors demonstrates that Wyoming has a significant interest in this case, the section 188 contacts analysis demonstrates that the most significant contacts regarding the specific issue under review are with Oklahoma.

Accordingly, the Court concludes that Oklahoma law supplies the statutory deadlines for payment of oil and gas proceeds, which apply to the extent that such deadlines are not displaced by the JOA, as well as the penalty for failure to make payments timely.  Texas law will govern all other substantive aspects of this motion.  With this

in mind, the Court turns to the merits of the motion.

C.    Analysis

In its complaint, Bonn alleges that Devon breached the JOA in several ways.  Devon first addresses Bonn's allegation that Devon breached the JOA by failing to provide notice of the Marquis Federal 15W-12 well prior to such well's being drilled and completed.  [Mtn. at 6; Comp. at 3, ¶9.]  Bonn acknowledges receipt of the February 12 letter which "furnished the required statement (AFE)" and gave Bonn the option to consent to the Marquiss 15W-12. [Comp. at 3, ¶9.] According to Bonn, however, the JOA requires written notice before drilling and completion and Devon had begun drilling the Marquiss 15W-12 prior to the February 12 letter.

In support of this argument, Bonn alludes to the language of section 12 of the JOA.  Although Bonn never cites a specific portion of section 12, which is two pages long, the section provides in relevant part, "If all the parties [to the JOA] cannot mutually agree upon the drilling of any well on the Unit Area . . . any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation." [Mtn. App. at 86.]  Bonn apparently argues that this and other uses of the word "proposed" in the JOA indicates that the notice must be provided before drilling on a well begins.

In *Valence Operating Company v. Dorsett*, the Texas supreme court

20

addressed a fact pattern much like the case at bar. Under the operating agreement at issue there, "the party desiring to drill, complete, rework, deepen or plug back" a well was required to "give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation." *Valence Operating Co.*, 164 S.W.3d at 662. After notice was provided, the non-operator had thirty days to elect to participate in the costs of the proposed operation. *Id.* The operator in *Valence* provided the non-operator notice of its intent to drill wells as required by the operating agreement but began preparatory work, and in some cases began drilling, before the thirty days elapsed. *Id.* at 660. Ultimately, the non-operator did not respond to the notices and the operator assessed the non-consent penalty as set out in the operating agreement. *Id.*

The non-operator sued, arguing that commencement of drilling before the thirty-day notice period expired constituted a breach of the operating agreement and prevented imposition of non-consent penalties. The operator responded that the thirty-day notice period only ensured the non-operator an established amount of time to elect whether to participate and had no bearing on when operations could commence. After review of the operating agreement's provisions, the Texas supreme court agreed with the operator, stating the notice provision "places no temporal limitation on [the operator's] ability to commence work on the proposed projects. . . . [T]he thirty-day

notice period sets a deadline for [the non-operating interest holder] to decide whether to participate in proposed operations. Nothing in the language of the Agreement forbids the operator from commencing work before the end of the notice period." *Id.* at 662.

The court noted that the operating agreement in *Valence* did contain a temporal limitation, in that the agreement required the operator to commence work no later than sixty days after the expiration of the thirty-day notice period. *Id.* at 662-63. This limitation acted as a deadline for the commencement of work, not as a prohibition against starting work before a particular date. *Id.* at 663.

Similarly, the JOA in this case requires notice of proposed operations. [Mtn. App. at 86.] The notice provision in the JOA is similar in all material respects to the notice provision in *Valence.* Thus, just as in *Valence*, the notice requirement in the JOA imposes no restriction on when Devon, as the operator, may begin operations. And while the JOA includes a clause requiring operations to begin within 30 days of the expiration of the notice period again, as in *Valence*, this operates as a deadline on when operations must begin. Thus, Devon's beginning of operations before notice was provided to Bonn was not a breach of the JOA.

In fact, during his deposition, Aaron Cawley, Bonn's co-founder and managing partner, acknowledges that the JOA contained no provision requiring balloting prior to drilling. [Mtn. App. at 31-32, 41 (Cawley deposition).] Cawley goes on to recognize that Bonn suffered no

damages as a result of Devon's beginning drilling prior to balloting Bonn. [Id. at 37-39.] Damages are a necessary element of a breach-of-contract claim. *See Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 355 (Tex. App.--San Antonio 1998, pet. denied). Thus, Bonn's claim based on the late balloting would fail for this reason as well.

Moreover, this Court has already ruled that Bonn waived any claims related to Devon's late balloting. [Doc. #48.] In an order denying Bonn's motion for summary judgment, the Court noted that "it is undisputed that Devon Energy's notice to Bonn fully informed Bonn that the [Marquiss Federal 15W-12] well had been drilled, was completed, and was producing. The notice detailed the costs and its production." [Id.]

Bonn insists that although notice of and disclosures regarding the operations were provided, they were deficient. Specifically, Bonn contends that in regard to the Marquiss Federal 15W-12, Devon did not provide notice of the proposed depth of the well or of the actual depth of the producing well. Bonn also contends that Devon breached the JOA by providing an estimate of $120,000 in costs despite the fact that Devon knew the costs because the well was completed. Even so, as noted in the Court's prior order denying Bonn's motion for summary judgment, Bonn waived any deficiencies in the balloting by electing not to consent to the wells proposed by Devon. That is, with full knowledge that it may possess mineral interests subject

to a JOA and that it had thirty days to elect whether to consent to Devon's proposed operations, and with knowledge that the Marquiss Federal 15W-12 had been fully drilled and completed, Bonn elected not to consent to its drilling, thereby waiving its right to contest any deficiencies in the notice. *See GP Plastics Corp. v. Interboro Packaging Corp.*, 108 Fed. Appx. 832, 836 (5th Cir. 2004) ("Under Texas law, the elements of waiver are (1) an existing right, benefit, or advantage; (2) actual or constructive knowledge of its existence; and (3) actual intent to relinquish that right."). Bonn asserts that without full disclosure from Devon, Bonn could not waive its rights. Texas law, however, requires only constructive knowledge of the existence of a right. *See id.* In his deposition, Cawley acknowledges that, on behalf of Bonn, after receiving Devon's notice that disclosed Bonn may have an interest in the Marquiss 15W-12 well, that such well had been drilled and completed, and providing Bonn with thirty days to make an election, he elected to go non-consent. [Mtn. App. at Exhibit A-1 (ballot and enclosures provided to Bonn); at 39 (Cawley deposition).] And, as acknowledged by Cawley, his election was clearly pursuant to the terms of the JOA. [See id.] Indeed, the ballot and the enclosures provided to Bonn note that a joint operating agreement was in place and that Bonn's election was pursuant to such agreement. [Mtn. App. at Exhibit A-1, p.4, 6.] The letter to Bonn concludes "[s]hould you need additional information or wish to discuss this matter further, please advise." [Id. at 5.] Thus, it is undisputed

that Bonn was aware it had the right to disclosure of information regarding the Marquiss 15W-12 well.

Regardless of any waiver by Bonn, as noted by Devon, Bonn has offered no evidence that it was harmed as a result of the omission of certain information from Devon's notices. Under Texas law, to maintain a claim for breach of contract the plaintiff must establish that the breach caused damages. *See*, 974 S.W.2d at 355. Thus, even assuming that the deficiencies in the balloting were not waived and constituted a breach of the JOA, Bonn's claims fail on this point due to a lack of evidence.

According to Bonn, Devon has also failed to provide documentation of equipment used, costs incurred, quantities of oil and gas produced, and the amount realized from the sale of oil and gas. [Comp. at 2-3, ¶7.] Bonn also contends that Devon has not provided a monthly itemized statement of costs and liabilities incurred in the operation of the wells, along with a statement of the proceeds realized from the sale of oil and gas. Devon responds that it "provided Bonn with payout statements that provided most, if not all, of the information required by the provisions of the JOA, including a summary of revenue, expenses, and payout date." In its briefing, Devon does not pursue this response to Bonn's argument any further than this single statement. Thus, neither will the Court.

Devon also argues that Bonn may not pursue these claims because its representative, Cawley, disavowed such claims. But Cawley's

statements are not explicit, and instead seem to be a statement of the facts of the case generally as he understood them at the time of the deposition. Again, Devon provides no meaningful briefing of the issue and, therefore, the Court does will not pursue it further.

Devon next responds that there is no evidence that these acts constituted breaches of the JOA or that such acts resulted in damages to Bonn. The JOA by its terms requires the disclosures of which Bonn complains. [Mtn. App. at 86-87. ¶12.] And Bonn cites to an affidavit by Cawley as some evidence these disclosures were never provided to Bonn. In his affidavit, after discussing the disclosures required by paragraph 12 of the JOA, Cawley states "Devon has never furnished Bonn any of the above documents." [Bonn Mtn. App.[4], Cawley Aff. at 5.].

Cawley's affidavit is contained in Bonn's appendix in support of Bonn's own motion for summary judgment that Bonn filed on November 26, 2007. In response, Devon filed a response brief and a motion to strike Bonn's summary-judgment evidence. The Court denied Bonn's motion for summary judgment, due in large part to its granting Devon's motion to strike. In the order granting the motion to strike and denying the motion for summary judgment, the Court noted that "most of Bonn's evidence is conclusory, unauthenticated, and contains numerous spreadsheets lacking attestation and any explanation as to

---

[4] "Bonn. Mtn. App." refers to the appendix Bonn submitted in support of its own motion for summary judgment [doc. #10].

what the numbers on those sheets mean." [Doc. #48.]  Further, the
Court noted that Cawley's affidavit "contains inadmissible hearsay
and conclusory statements" not otherwise supported by the record.
[Id.] Large portions of Bonn's summary-judgment appendix, including
large portions of Cawley's deposition, were struck.  These portions
of Bonn's appendix are not competent summary-judgment evidence.  And
although Bonn has submitted a supplemental appendix in support of
its response to Devon's motion, Bonn does not direct the Court to
any portion of that appendix that supports this claim.  Nor has the
Court's review of the appendix disclosed evidence in the supplemental
appendix supporting this claim.  *Skotak*, 953 F.2d at 915-16 & n.7
(stating Rule 56 "does not impose on the district court a duty to
sift through the record in search of evidence to support" a party's
opposition to summary judgment).

And, even if Cawley's affidavit and Bonn's other summary-judgment
evidence is considered, Bonn has failed to demonstrate how the fact
that Devon failed to provide the required disclosures or how any
deficiencies in the disclosures resulted in harm to Bonn.  Again,
as noted above, Bonn merely complains that certain documents were
not provided, citing Cawley's affidavit in support.  In his affidavit
Cawley refers to a convoluted table setting out cross-references to
documents and indexes set out in the appendix.  The Court is at a
loss for what this means or how it bears upon Bonn's claims based
on Devon's failure to provide certain documents.  And at no point

does Bonn, in its response to Devon's motion, as required by both precedent and the local rules, simply cite to facts set out in its original or supplemental appendix that would defeat the motion on this point. *See id.* Accordingly, the Court will grant Devon's motion on this point.

Bonn next argues that under paragraph 12 of the JOA, when the consenting party, here Devon, has recovered from the non-consenting party, here Bonn, the various amounts set forth in the JOA as non-consent penalties, the interest automatically reverts to the non-consenting party. [Comp. at 3, ¶8.] Specifically, the JOA provides:

> In accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production form such well accruing with respect to such interest until it reverts) shall equal the total of the following [percentages of certain costs.]

[Mtn. App. at 86.] The JOA goes on to state "[i]f and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it." [Id. at 87.]

Bonn's argument in this regard is not entirely clear. In its complaint Bonn states that Devon "converted the interest at the end of the month in which payout occurred instead of at the time of

28

payout." [Comp. at 5, ¶18.]  In its response, Bonn states that Devon has not "repa[id] Bonn the monies due for the revenue retained during the months in which payback had occurred." [Resp. Brief. at 12.] So long as Devon's end-of-the-month calculations took into account the fact that Bonn's interest had reverted during the month, then there seems to be no harm to Bonn.  However, if Devon retained outright the proceeds of production until the end of the month in which non-consent penalties were recouped and treated the end of the month in which such penalties were recouped as the date of reversion, then Bonn may have suffered harm.  This appears to be Bonn's argument.

Devon asserts that nothing in the JOA requires it to pay Bonn's interest on a particular day.  According to Devon, it is common industry practice for payouts to be calculated on the last day of the month.  This practice, Devon insists, is embodied by the Council of Petroleum Accounting Societies ("COPAS")'s guidelines.  Section VIII F of COPAS Accounting Guideline 13, entitled "reversion of interest" explains that:

> If and when the consenting owners recover the specified amounts from the proceeds of production attributable to a non-consenting owner's interest, the relinquished interest will automatically revert to the non-consenting owner at the point in time specified in the agreement. Unlike Farmout[5] agreements, there is no back-in election under an operating agreement. After reversion, the non-consenting

---

[5]  A farmout is "an arrangement used primarily in the oil and gas industry, in which the owner or lessee of mineral rights (the first party) assigns a working interest to an operator (the second party), the consideration for which is specified exploration and/or development activities. The first party retains an overriding royalty or other type of economic interest in the mineral production."  *See* www.teachmefinance.com

> owner owns the same interest in the well, including the
> operating rights and working interest, the related material
> and equipment, and the production from the well as it would
> have owned had all parties participated in the operation.
> Therefore, the nonconsenting owner shall pay its proportion-
> ate share of the subsequent costs of the operation of the
> well in accordance with the terms of the applicable
> operating agreement and accounting procedure, or force
> pooling if applicable.

[Mtn Brief at 20 (citing COUNCIL OF PETROLEUM ACCOUNTANTS SOCIETIES, ACCOUNTING FOR FARMOUTS/FARMINS, NET PROFITS INTEREST AND CARRIED INTEREST (FORMERLY KNOWN AS BULLETIN 9) (2006).] With this guideline, Devon argues that the purpose of the JOA's automatic reversion language was to distinguish it from a farmout agreement.

Whether a contract is ambiguous and the application of an unambiguous are matters of law for the court. *See Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). A contract is unambiguous when it can be given a definite or certain legal meaning. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co.*, 164 S.W.3d at 662. Provisions of a contract must be interpreted in light of the contract as a whole. *See Coker*, 650 S.w.2d at 393.

The Court concludes that even if "automatic reversion" generally has a technical meaning in light of industry practice, that meaning does not govern Bonn's entitlement to its interest after Devon recoups

non-consent penalties. As argued by Bonn, the JOA does not refer
to or otherwise demonstrate an intent to incorporate COPAS standards.
The plain language of paragraph 12 of the JOA provides for limitation
of a non-consenting party's relinquishment of its interest and a
consenting party's entitlement to such interest. Paragraph 12 provides
that a non-consenting party relinquishes its interest "until" the
value of the non-consenting party's interest and rights in, and
proceeds of production from, the well equal certain enumerated amounts
stated in percentage of certain costs. [Mtn. App. at 86.] Perhaps
more importantly, the language of the JOA clearly states that the
non-consenting party's interest "automatically reverts" to it "when
the Consenting Parties recover" the non-consent penalties provided
in the JOA, not at the end of the month when this occurs. Thus,
Devon's arguments are not supported by the language of the JOA. And
although Bonn's summary-judgment appendix was struck and Bonn fails
to properly support this claim with new summary-judgment evidence
as part of its response, Devon did not advance a no-evidence argument
as to this claim. Devon's motion on this point will, therefore, be
denied as to this claim.

Bonn also contends that Devon violated the JOA by charging for
expenses and penalties not allowed by the agreement [Comp. at 3-5,
¶¶10-19.] As to the Marquiss Federal 15W-12 well, as discussed above,
Devon did not breach the JOA by beginning operations before it sought
Bonn's consent. It is uncontested that under the JOA, once its consent

was sought, Bonn had two options--consent or go non-consent. [Mtn. App. at 86, ¶12 (JOA).] Cawley acknowledges as much in his deposition. [Mtn. App. at 31-32 (Cawley depo.).] And, under the plain terms of the JOA, having elected to go non-consent, Bonn was subject to the non-consent penalties. [Mtn. App. at 86, ¶12(A) and (B) (describing the interests relinquished by non-consenting parties to consenting parties).] Accordingly, as to the Marquiss 15W-12 well, Devon's motion will be granted.

Bonn further contends that it was overcharged for expenses relating to the Fuller Ranch 27-3 central delivery point ("CDP"). Bonn argues that the expenditures for a project are limited to $5,000 under the JOA without consent or proper balloting. Bonn concedes that it received a notice of charges in the amount of $39,200 for the CDP regarding the Marquiss Federal 15W-16 and that a CDP is necessary for production. It is Bonn's position that, after this initial CDP charge regarding Marquiss Federal 15W-16, no additional CDP charges were necessary regarding that well but that on three subsequent occasions Devon issued two AFEs and a voucher for CDP expenses on it.

Devon explains, and the uncontested evidence establishes, the Fuller Ranch 27-3 CDP was originally constructed to service two wells in which Bonn had an interest--the Marquiss 15W-16 and the Fuller Ranch 23W-14. [Mtn. App. at 69, ¶8 (Dan Leslie Aff.).] The CDP was expanded to service an additional well in which Bonn holds an

interest--the Fuller Ranch 25W-4.  Devon acknowledges that charges
to the CDP for the installation of pipe from the Fuller Ranch 25W-4,
and six other wells in which Bonn holds no interest, were incorrectly
charged to the wells originally served by the CDP.  But according
to Devon, Bonn was never charged for the expansion of the CDP to serve
the Fuller Ranch 25W-4 well.  Based on this, along with other alleged
cost-allocation mistakes, Devon asserts that after offsets and credit
the net effect is that Devon does not owe Bonn for overcharges
regarding the Fuller Ranch 27-3 CDP.

Devon also contends that CDP charges for the Marquiss 15W-16
were proper because Bonn was balloted and it responded by electing
to go non-consent.  Devon cites to an AFE in Bonn's summary-judgment
appendix that discloses an estimate of CDP costs related to the
Marquiss 15W-16 of $39,200. [Bonn Mtn. App. at 42.]  This document
was not subject to the motion to strike. [App. to Devon's Mtn. to
Strike, "Exhibit E" at 20 (listing documents to which Devon objected).]
Additionally, Devon has provided the affidavit of Dan Leslie, a Devon
accountant, who states that Bonn was properly balloted and elected
to go non-consent regarding the CDP charges on the Marquiss 15W-16
well.

Devon also relies upon Leslie's affidavit in arguing that after
offsets and credits it does not owe Bonn for CDP charges.  Although
this assertion appears uncontested, the Court concludes that such
evidence is too conclusory to support Devon's motion for summary

judgment. Leslie simply states that after an investigation of Bonn's claims and correction of various erroneous cost allocations Devon is entitled to offsets and credits resulting in Devon's being owed $26,607. [Mtn. App. at 70 (Leslie Aff.).] At no point does Leslie refer to the documents, dollar amounts, or math that led to this conclusion. As to CDP charges, Devon's motion will be granted regarding the Marquiss 15W-16 but will otherwise be denied.

Finally, Devon raises no-evidence points to several of Bonn's claims. Bonn contends that Devon failed to operate the Marquis Federal 15W-14 in a good and workmanlike manner. [Comp. at 5, ¶20.] To establish that an operator failed to operate a well in a good and workmanlike manner, the plaintiff must establish that the operator failed to act as a reasonably prudent person engaged in drilling oil wells. *Norman v. Apache Corp.*, 19 F.3d 1017, 1029 (5th Cir. 1994). Devon contends that the duty of care owed by an operator is not a matter within the knowledge of the average juror but is instead an area of specialized knowledge requiring expert testimony. The Court agrees. Federal courts generally defer to state law on the question of "the kind of evidence that must be produced to support a verdict." *Ayres v. Sears, Roebuck & Co.*, 789 F.2d 1173, 1175 (5th Cir. 1986). Texas courts often require an expert opinion to establish the standard of care, as well as any breach thereof, when dealing with areas of specialized knowledge or expertise. *Alexander v. Turtur & Assoc., Inc.*, 146 S.w.3d 113, 119-20 (Tex. 2004) (expert testimony required

in legal malpractice case); *Hood v. Phillips*, 554 S.W.2d 160, 165-66 (Tex. 1977) (stating that expert testimony is generally required to establish duty of care in medical malpractice case). Bonn does not address this in its brief and fails to otherwise point to evidence in support of this claim. Devon's motion on this point will, therefore, be granted.

Devon similarly contends that Bonn has failed to support all of its claims in regard to damages with the necessary expert testimony. Bonn argues that calculation of damages will require establishing what constitutes drilling and completion costs under the JOA and then a calculation of the amounts improperly withheld by Devon. Bonn responds, and the Court agrees, that establishing what the parties intended to constitute drilling and completion costs does not require expert testimony. Nor has Devon established that an expert is required to perform the basic mathematics at issue in this case. Devon's motion will be denied on this point.

Devon also argues that Bonn has failed to produce evidence in support of Bonn's claims "that Devon breached the JOA by charging penalties and expenses not allowed under the JOA, charging for 'operating expenses' before production began, charging a 'non-consent penalty' for work done after the wells were drilled and completed with no additional 'AFE' notice of the proposed operation and cost, charging investment charges, charging consulting fees, making charges not allowed in the agreement, making duplicate charges, making coding

errors, improperly allocating cost, failing to give Bonn a credit for unspecified expenditures, calculating payout at the end of the month, failing to conduct operations in a good and workmanlike manner and in a grossly negligent manner, charging expenses, including electricity, for a well not producing, and failing to pay interest." [Mtn. Brief at 30 (citing various portions of Bonn's complaint).]

In responding to this general no-evidence argument, Bonn continuously cites to the appendix in support of its own motion for summary judgment. The bulk of that appendix has been stricken. Further, a review of Bonn's response discloses that not only its evidence, but its arguments are conclusory. Bonn's response is filled with statements such as "Devon violated the MFOA (the JOA) by charging Bonn for expenses and penalties that are not contractually allowed." [Resp. Brief. at 8.] Bonn fails to explain or cite to evidence that would explain what expenses and penalties it is referring to. Indeed, Bonn's response to Devon's summary-judgment motion is not simply without evidentiary support, but consistently fails to clearly respond to Devon's motion. Devon's motion will be granted as to these claims.


III.  Conclusion

Accordingly, Devon's motion is DENIED with regard to Bonn's claims that Devon was not entitled to retain any proceeds relinquished by Bonn as a non-consent penalty after the amounts specified in the JOA were recouped by Devon. Devon's motion is also DENIED with respect

to Bonn's claim that certain CDP charges related to the Fuller Ranch 25W-4 and Fuller Ranch 23W-14 were improper. Devon's motion is also DENIED regarding its argument that Bonn is required to produce expert testimony to support its damage figures. Finally, the Court concludes that Oklahoma law governs whether Devon timely paid Bonn its share of proceeds of production to the extent the JOA does not address the timing of payments. Oklahoma law also provides the penalty to be assessed for untimely payments. In all other respects, Devon's motion is GRANTED.

SIGNED February 26, 2009.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/jar